[Cite as *State v. Lawrence*, 2014-Ohio-3477.]

STATE OF OHIO )  IN THE COURT OF APPEALS
)ss:  NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT )

| | |
|---|---|
| STATE OF OHIO | C.A. No.   27184 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| BRIAN J. LAWRENCE | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.   CR 13 05 1308 |

DECISION AND JOURNAL ENTRY

Dated: August 13, 2014

WHITMORE, Judge.

{¶1}  Defendant, Brian Lawrence, appeals from the judgment of the Summit County Court of Common Pleas.  This Court affirms.

I

{¶2}  In the spring of 2012, M.J. was 12 years old and attended school with a girl named Stephanie.  M.J. had been to Stephanie's house a couple of times to play and, sometime that spring, was given permission to spend the night.  M.J. went over to Stephanie's house about 8:00 p.m.  Stephanie, her parents, her ten-year-old brother, Nick, her five-or six-year-old cousin, Josh, and her 18-year-old cousin, Lawrence, were all at the house when M.J. arrived.

{¶3}  At about 9:00 p.m. the children were told to get ready for bed.  According to M.J., Stephanie, Josh, and M.J. went to Stephanie's room, put in a movie, and fell asleep in Stephanie's bed.  M.J. said that she woke when Lawrence came into the room and told Josh to leave.  M.J. stated that Lawrence then took Josh's spot in the bed and began fondling her.  M.J.

testified that Lawrence fondled her breasts and her vagina and took her hand and placed it on his penis. M.J. said she was too scared to say anything so she just pretended to be asleep. M.J. stated that when Stephanie's father called up the stairs to Lawrence that he had better not be "messing with" the girls, Lawrence stopped touching her and left the room.

{¶4} In the fall of 2012, children's services was notified of the allegations that Lawrence had improperly touched M.J. and a police investigation ensued. Detective Jerry Gachett interviewed Lawrence three times about the allegations. The first time, in December 2012, Lawrence said that "he honestly couldn't remember doing anything like that." In his second interview, in April 2013, he admitted to touching M.J., but thought that it was okay because he thought she was 19 years old. In his third interview, in May 2013, Lawrence again admitted to touching M.J. and said he thought she was 19.

{¶5} Lawrence was indicted on two counts of gross sexual imposition, in violation of R.C. 2907.05(A)(4), felonies of the third degree. He was convicted by a jury of both charges and sentenced to a total of sixty months in prison. Lawrence now appeals and raises one assignment of error for our review.

II

Assignment of Error

THE JURY'S VERDICT AND THE DEFENDANT'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND/OR IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶6} In his sole assignment of error, Lawrence argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

**Sufficiency**

{¶7} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.

{¶8} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

{¶9} R.C. 2907.05(A)(4) provides that "[n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶10} Lawrence does not dispute that M.J. was 12 years old at the time of the incident and that she is not his spouse. Therefore, we limit our review to whether the State has presented sufficient evidence of sexual contact.

{¶11} M.J. testified that, in late spring or early summer 2012, she spent the night at Stephanie's house. M.J. knew Stephanie from school and had been over to her house a couple of times before. M.J. stated that she arrived at Stephanie's house after dinner, approximately 8:00 p.m. Stephanie, her parents, her ten-year-old brother, Nick, her five- or six-year-old cousin, Josh, and her 18-year-old cousin, Lawrence, were all at the house when M.J. arrived. According to M.J., they played, watched TV, and played video games. M.J. explained that she, Stephanie, Nick, and Josh played video games in Stephanie's bedroom for about 10 to 20 minutes before being told that it was time to go to bed. M.J. said that Lawrence was not upstairs at that time. M.J. testified that, about 9:00 p.m., Stephanie, Josh, and M.J. lay down on Stephanie's futon bed and fell asleep watching a movie.

{¶12} M.J. testified that, after falling asleep, she heard Lawrence enter the bedroom and tell Josh to get out of the bed. M.J. stated that Lawrence then took Josh's place next to her and she pretended to be asleep. M.J. said that Lawrence then started touching her breasts, at first on top of her clothes and then underneath them. According to M.J., Lawrence then put his hand in her pants and "into [her] vagina." M.J. said that she continued to pretend to be asleep and did not say anything because she was too scared. M.J. did, however, turn to face the opposite direction after Lawrence touched her vagina. M.J. said she was trying to wake Stephanie, who was still asleep next to her. M.J. testified that after she turned away from Lawrence, he took her hand and placed it in his pants and on his penis. At some point thereafter, M.J. said she heard Stephanie's father yell up to Lawrence, "You better not be messing with them girls." Lawrence then got out of the bed and left. M.J. testified that she woke early the following morning and left because her mother was there to pick her up.

**{¶13}** "[I]n sex offense cases, * * * the testimony of the victim, if believed, is sufficient to support a conviction, even without further corroboration." *State v. Powell*, 9th Dist. Lorain No. 12CA010284, 2014-Ohio-63, ¶ 20, quoting *State v. Evans*, 9th Dist. Medina No. 09CA0049-M, 2010-Ohio-3545, ¶ 12. M.J. testified that Lawrence touched her breasts and vagina and placed her hand on his penis. Her testimony, if believed, was sufficient to support Lawrence's convictions for gross sexual imposition. *See id.* Lawrence's assignment of error, as it relates to sufficiency, is overruled.

**Manifest Weight**

**{¶14}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

**M.J.**

{¶15} M.J. said that, during the evening of the sleepover, she was "play fighting" with Lawrence and that he picked her up and put her down on Stephanie's bed. M.J. denied ever telling Stephanie or Lawrence that she thought Lawrence was cute or that she was 18 years old. Throughout her testimony at trial, M.J. repeatedly called Lawrence "Brandon" instead of "Brian." She explained that she had just seen a friend named Brandon and was confusing the names because they are similar.

{¶16} M.J. testified that her parents are divorced and that she has been going to counseling since 2009. The focus of this counseling was not discussed at trial. M.J. admitted that she had a Facebook page that contained false information. M.J.'s profile page lists her as an 18- or 22-year-old married woman from Atlanta who is studying medicine at Kent State University. M.J. explained that she lied about her age because she was under 13 years old at the time and could not sign up for a Facebook account using her real birthday.

{¶17} M.J. said that she told a teacher's aide in April 2013 about what had happened because she was "frustrated over it." She could not concentrate or study and "started busting out crying in class." M.J. also testified that she had spoken about the incident to a social worker at the Children at Risk Evaluation Center ("CARE") in October or November 2012.

**Tyla Dudley**

{¶18} Tyla Dudley, a social worker at CARE, interviewed M.J. on October 22, 2012. Dudley said that M.J. was referred to CARE by children's services for suspected sexual abuse. Dudley described M.J. as "shy[,] but * * * forthcoming." She testified that M.J. was "anxious and fidgety" and appeared, at times, to be talking to herself. Dudley did not recall M.J. getting emotional or crying during the interview.

{¶19} According to Dudley, M.J. told her that she was touched by Lawrence while she was at her friend's house. Dudley said that M.J. told her that she had lain down to sleep in Stephanie's room and that Lawrence had come in and touched her "on her chest and her pocketbook." Dudley asked M.J. to clarify what her "pocketbook" was and M.J. told her that it was the area "used to pee." Dudley also said that M.J. told her that Lawrence had taken her hand and placed it on his penis.

{¶20} Dudley testified that she was not aware that M.J. had told a teacher's aide about the abuse. M.J. only told Dudley that she had told a friend. Dudley did not ask M.J. when she told her friend and explained that there is "routinely" a delay in victims reporting sexual assaults. Dudley also testified that she was not aware of how the allegations were reported to children's services; she only knew that children's services referred M.J. to CARE for evaluation. Dudley said that her interview with M.J. was one-on-one, but was being watched by a children's services worker and Detective Jerry Gachett from the Akron Police Department.

**Detective Jerry Gachett**

{¶21} Detective Gachett testified that he watched Dudley's interview of M.J, but did not interview M.J. himself. He explained that there was no need to put M.J. through the stress of an additional interview because he had enough information to investigate the allegations.

{¶22} Detective Gachett stated that he had three interviews with Lawrence. He first spoke with Lawrence in December 2012 and told Lawrence about the allegations against him. Lawrence told Detective Gachett that "he honestly couldn't remember doing anything like that." He also told Detective Gachett that it was a bad time in his life and that he was abusing alcohol. Detective Gachett testified that he did not file charges against Lawrence at that time because he wanted to investigate further, including speaking to Lawrence at the police station. Detective

Gachett attempted to speak to Stephanie, but said that her mother would not give him permission to do so.

{¶23} In April 2013, Detective Gachett spoke briefly with Lawrence by phone. Lawrence called him back about an hour-and-a-half later. According to Detective Gachett, Lawrence told him that he had been doing some thinking and that he did remember "being with a girl" but thought that she was 19 years old. According to Detective Gachett, Lawrence said that he and M.J. talked and played video games together and that, later that night, they were in bed together and he started "fondling her breasts and her vaginal area." He then told Detective Gachett that he "got a gut feeling that something wasn't right" so he stopped and got out of the bed.

{¶24} After the April 2013 phone conversation, Detective Gachett filed charges against Lawrence for gross sexual imposition and a warrant was issued for his arrest. On May 10, 2013, Gachett conducted his third interview of Lawrence at the police station. The interview was recorded and a portion of it was admitted into evidence. After receiving his *Miranda* warnings, Lawrence told Detective Gachett that he wanted to explain what had happened that evening. In the interview, Lawrence said that he was playing video games in his uncle's bedroom with Nick and Nick's friend. Lawrence said that Stephanie and M.J. came into the room at some point and Stephanie told him that M.J. thought he was cute and that she was 19 years old. Lawrence told Detective Gachett that the group all went into Stephanie's room to watch a movie, M.J. rolled up next to him, and he started to "feel her up." Lawrence said that M.J. pushed his hand down toward her vagina and she touched his penis. Lawrence admitted to touching her vagina, but stopped when he got a "gut feeling" that something was wrong. He then got out of the bed and

left. Detective Gachett testified that Lawrence was crying during the interview and appeared to be remorseful.

**Detective Paul Siegferth**

{¶25} Detective Paul Siegferth, with the Akron Police Department, was assigned to the U.S. Marshal's Fugitive Task Force in May 2013. As part of his duties, Detective Siegferth was responsible for locating and arresting people with outstanding warrants.

{¶26} Detective Siegferth testified that on May 10, 2013, he was contacted by Detective Gachett to execute an arrest warrant for Lawrence. According to Detective Siegferth, Lawrence was located that day and arrested without incident. Detective Siegferth said that Lawrence became "very emotional and upset and kept asking [him] over and over again what[ was] going on." Detective Siegferth told Lawrence that all he could tell him was that a warrant was issued from the Juvenile Bureau for gross sexual imposition. Lawrence then said, "She was 11 but I thought she was 19."

**Stephanie**

{¶27} Stephanie testified that she, Lawrence, Nick, and M.J. were playing video games in her father's room and M.J. kept telling Stephanie how cute she thought Lawrence was. Stephanie testified that after the video games, M.J. and Stephanie went upstairs to Stephanie's bedroom, put in a movie, and fell asleep. Stephanie said that she slept until 10:00 a.m. the following morning when M.J.'s mother came to pick her up. Stephanie said that it was possible that someone came into the room during the night while she was sleeping, but that she did not hear anyone. According to Stephanie, M.J. was not acting abnormal before she left that morning. Stephanie admitted that she loved her cousin, Lawrence, and did not want to see him in trouble.

**Nick**

{¶28} Nick, Stephanie's ten-year-old brother, testified that he was playing video games with Lawrence in his father's bedroom and the girls were playing in Stephanie's room. Nick did not remember the girls ever coming into his father's room. Nick said that after about an hour of video games, he and Lawrence went upstairs to his bedroom to watch TV. Nick stated that Lawrence slept with him in his bed that night and that Lawrence went to bed before Nick. Nick testified that he is a light sleeper and never heard Lawrence leave the room during the night, but that it was possible Lawrence could have gotten up. Nick testified that Lawrence was still sleeping when he got up.

{¶29} Nick said that, later that morning, he, Stephanie, and M.J. went over to his friend's house and M.J.'s mother picked her up from there. According to Nick, neither M.J. nor Lawrence were acting unusual or strangely. Nick testified that he thought he saw M.J. the following day at her friend's house. Nick said that M.J. brought up Lawrence's name and said that she thought "he was cute and she kind of liked him."

**Lawrence**

{¶30} Lawrence testified that he never touched M.J. Lawrence said that, on the night in question, he watched football with his uncle and then played video games with Nick. Lawrence stated that he and Nick then went to Nick's room and watched some TV before falling asleep. According to Lawrence, he never left Nick's room until he woke at noon or 1:00 p.m. the following day. Lawrence said he woke, watched SportsCenter with his uncle, and then left.

{¶31} Lawrence said that, in the spring of 2012, he was 18 years old and in the 10th grade at Life Skills. He had been prescribed Adderall for ADHD, but was not taking it regularly because it made him feel "brain dead" and it caused a loss of appetite. Around that same time,

Lawrence said he was homeless. He had left his mother's house because he'd gotten into an argument with his mother's boyfriend. Lawrence testified that he moved in with his father in May 2012.

{¶32} Lawrence testified that during the spring of 2013 he was abusing alcohol and smoking a lot of K2, a synthetic marijuana. According to Lawrence, he would smoke 40 cigarettes a day filled with K2 and that his addiction got so bad that he was seeing and hearing things. Lawrence said he became paranoid that the police were watching him and were out to get him. He explained that he confessed to touching M.J. in the April and May 2013 interviews because he thought that if he believed she was 19 then the police would leave him alone.

{¶33} The State questioned Lawrence about phone calls he made from the jail to his mother. In these recorded phone calls, Lawrence told his mother that he only touched M.J.'s breasts and that M.J. lied to him about her age. Lawrence also told his mother that Stephanie and Nick would need to testify that the touching was consensual and, if they did so, he would be acquitted. Lawrence testified that he had no memory of those phone calls and that he does not know what he was talking about because he never touched M.J. Lawrence explained that he was still under the effects of K2 at the time and that it took him about a month-and-a-half before he stopped hearing voices.

{¶34} "[C]redibility determinations are primarily for the trier of fact." *State v. Martin*, 9th Dist. Lorain No. 13CA010356, 2014-Ohio-875, ¶ 39, quoting *State v. Browning*, 9th Dist. Summit No. 26687, 2013-Ohio-2787, ¶ 18. "[T]he jury is in the best position to judge the credibility of witnesses because the jury 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Peterson*, 9th Dist. Summit No. 25592, 2012-Ohio-250, ¶

31, quoting *State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30. Having reviewed the record, we cannot conclude that the jury clearly lost its way in believing M.J.'s testimony over Lawrence's.

{¶35} Lawrence's assignment of error, as it relates to the manifest weight of the evidence, is overruled.

### III

{¶36} Lawrence's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

BELFANCE, P. J.
CARR, J.
CONCUR.


APPEARANCES:

RONALD T. GATTS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Proseuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.